# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Gauger v. Hendle*, 2011 IL App (2d) 100316

---

| | |
|---|---|
| Appellate Court Caption | GARY A. GAUGER, Plaintiff-Appellant, v. BEVERLY HENDLE, EUGENE LOWERY, and CHRISTOPHER PANDRE in Their Individual and Official Capacities; THE OFFICE OF THE McHENRY COUNTY SHERIFF, and THE COUNTY OF McHENRY, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2–10–0316 |
| Filed | June 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action against defendant county and other defendants seeking damages for plaintiff's arrest, conviction and incarceration for the murders of his parents, the trial court did not err in excluding the appellate court's Rule 23 order on plaintiff's direct appeal from his conviction and evidence showing how the murders were actually committed and how the "real killers" were discovered, since the Rule 23 order likely would have confused the jury and the excluded evidence did not support plaintiff's theory that defendants fabricated his confession. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 03–LA–292; the Hon. Maureen P. McIntyre, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Matthew C. Crowl and Thomas J. Henehan, both of Schiff Hardin LLP, of Chicago, for appellant. |

James G. Sotos, John J. Timbo, and Jeffrey N. Given, all of James G. Sotos & Associates, Ltd., of Itasca, for appellees.

| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1 Plaintiff, Gary A. Gauger, sued defendants, Beverly Hendle, Eugene Lowery, Christopher Pandre, the office of the McHenry County sheriff, and the County of McHenry[1] to recover damages for his arrest, conviction, and incarceration for the 1993 murders of his parents, Morris and Ruth Gauger. Following a trial on counts alleging malicious prosecution, conspiracy to maliciously prosecute, and indemnification, a jury rendered a verdict and answered special interrogatories in defendants' favor. Plaintiff appeals, arguing that the trial court erred in excluding: (1) this court's order on plaintiff's direct appeal of his conviction; and (2) evidence showing how the "actual murders" were committed and how the "real killers" were discovered. We affirm.

¶ 2                           I. BACKGROUND

¶ 3             A. Proceedings Prior to the Current Lawsuit

¶ 4 In October 1993, a jury convicted plaintiff of the April 1993 murders of his parents. On January 11, 1994, plaintiff was sentenced to death. On September 22, 1994, his sentence was reduced to two sentences of life imprisonment without parole.

¶ 5 In 1995, while plaintiff's direct appeal was pending, federal authorities were investigating the Outlaw Motorcycle Club, a gang. On about August 31, 1995, Outlaw member Mark Quinn, who was being held in the Du Page County jail, contacted Sandra DeValkenaere, a federal Alcohol, Tobacco, and Firearms agent. On September 2, 1995, Quinn told DeValkenaere that Outlaw members Randall Miller and James "Preacher" Schneider killed plaintiff's parents during a robbery. Information concerning the federal investigation was first provided to the McHenry County State's Attorney's office in late

---

[1]On the first trial day, plaintiff, pursuant to an oral stipulation, dismissed the county as a defendant.

1995.

¶ 6         On March 8, 1996, this court reversed plaintiff's conviction and remanded the cause for a new trial. *People v. Gauger*, No. 2–94–1199 (1996) (unpublished order under Supreme Court Rule 23). We held that, when the police originally took plaintiff in for questioning, they placed him in custody but lacked probable cause to do so; there was no probable cause until plaintiff made incriminating statements at the police station. *Id*. at 27-28. We also held that plaintiff's incriminating statements should have been suppressed because they constituted the fruits of the illegal arrest. *Id*. at 29. Finally, we determined that the evidence was sufficient to prove plaintiff guilty beyond a reasonable doubt and, accordingly, we remanded the cause for a new trial. *Id*. at 29-30.

¶ 7         In August 1996, plaintiff was released on home monitoring, pending the Illinois Supreme Court's decision on the State's petition for leave to appeal our decision. On October 4, 1996, following the supreme court's denial of the State's petition for leave to appeal (*People v. Gauger*, 168 Ill. 2d 606 (1996) (table)), the McHenry County State's Attorney dismissed by *nolle prosequi* the charges against plaintiff.[2]

¶ 8         On June 10, 1997, Schneider and Miller were arrested and Schneider confessed to the Gauger murders. Schneider later pleaded guilty to the murders, and Miller was convicted of federal racketeering charges that included the Gauger murders as predicate acts. In June 1997, after his arrest, Miller shared a cell block in the Waukesha County, Wisconsin, jail with Christopher Ignasiak. Over the next few weeks, Ignasiak kept notes of his conversations with Miller. Jail officials discovered the notes during a random search of Ignasiak's cell. The notes reflected that Miller had said that he was paid $3,000 "by the farmers' son" to "take out" the Gaugers; that Schneider had helped him; and that, if he had the opportunity, Miller would "slice" Schneider's throat as he did the Gaugers' for having told on him. Ignasiak submitted to questioning by federal investigators.

¶ 9         On October 1, 1999, plaintiff filed suit in federal court, raising both federal and state law claims against defendants for his alleged wrongful arrest and malicious prosecution. On September 24, 2002, the district court granted summary judgment in defendants' favor on the federal claims and declined supplemental jurisdiction over the state claims. *Gauger v. Hendle*, No. 99 C 50322, 2002 WL 31130087 (N.D. Ill. Sept. 24, 2002). On December 19, 2002, the Governor pardoned plaintiff based on plaintiff's innocence.

¶ 10        On October 30, 2003, the Seventh Circuit affirmed the dismissal of plaintiff's federal claims, except his false arrest claim. *Gauger v. Hendle*, 349 F.3d 354, 359 (7th Cir. 2003), *overruled on other grounds*, *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006), *aff'd*, *Wallace v. Kato*, 549 U.S. 384 (2007). Subsequently, the district court dismissed with prejudice the federal false arrest claim.

¶ 11                                    B. Current Lawsuit

¶ 12        On September 23, 2003, plaintiff filed a five-count complaint in state court against

---

[2]Plaintiff was incarcerated for 41 months.

defendants alleging malicious prosecution, false imprisonment, intentional infliction of emotional distress, and conspiracy and seeking damages under the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1–101 *et seq.*(West 2002)). After summary judgment was granted in defendants' favor on several counts, a trial proceeded on the counts alleging malicious prosecution, conspiracy to maliciously prosecute, and indemnification.

¶ 13　　Trial commenced on August 12, 2009.

¶ 14　　　　　　　　　　　　　　　1. Plaintiff

¶ 15　　Plaintiff, age 57, testified that he works as an organic vegetable farmer on his parents' farm, which is in Richmond, off of Route 173. In 1993, plaintiff, who was then age 41, lived on the farm with his parents, Morris (age 72) and Ruth (69). In addition to farming, plaintiff's parents also ran (on the farm) a motorcycle repair shop and sold rugs. Plaintiff and his parents lived in the farmhouse. The rugs were sold from a trailer on the property. The farmhouse was located on a 214-acre parcel that Morris and Ruth owned; the house was about 400 to 500 feet from the end of the driveway adjacent to Route 173.

¶ 16　　Plaintiff testified that he last saw his parents alive on Wednesday evening, April 7, 1993. His father went to bed at 8 p.m. because he had the flu. Plaintiff went to bed at 8:30 p.m. The next morning, Thursday, April 8, 1993, plaintiff awoke at 9 a.m. His parents were not in the house. Plaintiff ate in the kitchen. It was not a "big deal" to him that no one was in the house. Plaintiff was not certain where his parents were. He testified that his mother could have been away on errands; his father could have been in the shop or gone to Sugar Grove (Morris and Ruth had planned on going to Sugar Grove to purchase a tractor that their friend "Windy" (a man) had told them about, and Windy might have picked them up). Plaintiff looked for a note. He testified that he was in a hurry. He walked behind the house to the vegetable greenhouse.

¶ 17　　The rain had stopped, and plaintiff moved pepper plants out of the greenhouse. After he moved the plants, he returned to the greenhouse to start a fire to warm up the shop. Plaintiff smoked part of a marijuana joint. He had a motorcycle project he was working on. The bike's owner stopped by with another motorcycle for plaintiff to repair. After the owner dropped it off, he left. Plaintiff started working on the bike. Later, at about noon, Art Clokey, who was renting the barn, asked plaintiff to move a pig for him. Afterwards, plaintiff continued working until 6:30 p.m.

¶ 18　　While plaintiff walked across the field and to the house, he noticed a padlock on the rug trailer. This made him think that his parents had gone away, because the rug trailer was never locked unless his parents had gone away for the day. Plaintiff went into the house and ate. He looked for a note, but did not find one. Plaintiff then walked around the back of the house and checked a garage door. It was locked, which indicated to plaintiff that his parents were gone; they left it unlocked when they were home. Plaintiff returned to the shop to work on the bike. When he finished, he turned on the radio and finished smoking his joint.

¶ 19　　At 10 p.m., plaintiff returned to the house and saw a light on in the garage. He looked inside through a window and saw no one. He did not look through another window with

shrubbery in front of it; had he done so, he conceded, he would have seen his father's body. Plaintiff returned to the house. He became worried. Plaintiff testified that his parents would usually return by 10 or 10:30 p.m. He could think of no one to call. (His parents did not have cellphones.) Plaintiff waited by the phone until midnight and went to bed.

¶ 20      On Friday, April 9, 1993, plaintiff woke up about 9 a.m. and looked around the house. His parents were not in the house. A man drove up and asked when the shop was going to open; plaintiff told him that he did not know where his parents were and that the shop would not be opening that day. The visitor left. Plaintiff put up the gate and chain, picked up the newspapers, and returned to the house. At about 11 a.m., Morris's friend, Ed Zender, and his girlfriend, Traci Foskus, walked up the driveway. Plaintiff went outside and explained to them that his parents were missing. Zender asked for a British motorcycle nut, and they went to the garage to look for it. They entered the garage through a southwest door (plaintiff lifted the overhead door, which was unlocked) and proceeded toward the northwest corner to a box where the British nuts and bolts were kept. When they did not find what Zender needed, Zender suggested looking in the British parts section of one of the parts rooms, which was in the southeast section of the garage. They walked east into the first parts room. Plaintiff turned south to proceed down the first aisle, but his foot hit something on the floor and he backtracked and chose instead the middle aisle. Plaintiff and the visitors walked south into the second parts room. There, plaintiff discovered his father's body, face down, in a pool of blood.

¶ 21      Plaintiff called 911. The operator asked plaintiff how long he thought his father had been dead; plaintiff testified: "And at first I said about 24 hours. Then I realized I didn't know. So I said, well, he's been missing for about 24 hours." Plaintiff then searched for his mother. He checked her car. Plaintiff saw a key lying in the grass five feet from a blue Volkswagen that was outside the garage. Plaintiff thought this was unusual, and he later told the police about it.

¶ 22      After the police arrived, they asked to search the house. Plaintiff consented to the search and answered questions. He then attempted to call his brother, who lived in Whitewater, Wisconsin; plaintiff did not reach his brother. Plaintiff contacted his brother's neighbors and told them that his father was dead. He also called Francis, Ruth's best friend, and told her the news. While looking for Francis's number, plaintiff located Windy's number. He called Windy to tell him of Morris's death, and Windy gave a "bizarre" response, denying that he and Ruth were having an affair.

¶ 23      Plaintiff led police through their search of the house. At this point, he understood that the police suspected foul play. Detective Beverly Hendle was at the scene by 12:55 p.m. She questioned plaintiff. Plaintiff then spoke to the coroner. Plaintiff waited in the kitchen "in case anybody wanted to ask [him] any more questions" and made coffee. Plaintiff looked outside and realized that it was a sunny day. He was concerned that his plants, which were in closed cold frames, would burn. Plaintiff testified that he asked one of the officers if he could go open the cold frames. The officer told him he could do so. Plaintiff was gone for 15 to 20 minutes. He spoke to neighbors during this time and took a small "hit" of marijuana that one of his friends offered him. Plaintiff returned to the kitchen.

¶ 24        An officer asked plaintiff for a key to the rug trailer lock. When no key could be found, plaintiff suggested that the officers break the lock. Plaintiff walked outside. He saw the officer enter the trailer and then rush out; subsequently, two or three officers rushed inside. The officers discovered Ruth's body under a pile of rugs. One officer came out, pointed at plaintiff, and stated "don't let him go." Two officers then came up to plaintiff and escorted him to a squad car. Before he entered the car, the officers frisked plaintiff's pockets. He could not exit the squad car because there were no handles on the inside of the doors and there was a cage between the back and front seats. It was about 1 p.m.

¶ 25        Plaintiff waited in the squad car for 20 to 30 minutes. An officer came and opened one of the rear squad-car doors and the driver's-side door. The officer sat on the driver's side. Plaintiff asked if they had found his mother and if she was dead, and the officer replied in the affirmative. Plaintiff stated that he was afraid of that. He also said, "how could anybody do something like this for money?" Plaintiff testified that this was the only reason he could conceive of to explain why his parents were killed. Plaintiff did not cry; he testified that he did not show any emotions while with the officers, because he was in shock. Plaintiff asked to leave to urinate, and he did so behind a tree with the officer standing nearby. He was then escorted back to the squad car. After 45 minutes to 1 hour, plaintiff asked again to go urinate, which he did. He returned to the squad car and stayed for two to three hours.

¶ 26        Hendle approached the squad car and told the officer who waited there with plaintiff that they would be taking plaintiff to Woodstock. Plaintiff was escorted to another squad car and was told that he would be transported. Plaintiff asked whether they were "going for ridies," a reference to what his brother would say when he took his dogs for a ride. Plaintiff testified that he would "make comments sometimes when [he was] uncomfortable" and that he wanted to "lighten the mood," since he had been waiting for hours. "It was just a short flip comment" and there was "nothing to it." Hendle sat in the front passenger's seat, and plaintiff was transported to the sheriff's department. There, he was placed in an interrogation room. It was about 4 p.m.

¶ 27        The interrogation, which lasted 18 hours, was neither videotaped nor audiotaped, and none of plaintiff's statements was reduced to writing. According to plaintiff, the interrogation room was 12 feet wide and 20 feet long. Hendle led plaintiff into the room. Detective Eugene Lowery was waiting in the room. Hendle and Lowery read plaintiff his *Miranda* rights. Plaintiff then made a "flip comment" (*i.e.*, said "Que?," Spanish for "What?") when his rights were not read to him in Spanish. He then apologized for the comment, realizing that it was "inappropriate."[3] Plaintiff testified that he makes "flip comments" when he is nervous. Plaintiff did not request an attorney because he had nothing to do with his parents' murders and he wanted to cooperate with the police. The detectives interviewed plaintiff, asking him questions about the preceding two days. They then went over the events again. Plaintiff

_____

[3]Plaintiff testified: "I explained when I had done that, I read in a case in the paper months before about someone who had a [conviction] overturned because they hadn't read their rights in Spanish. It was a feeble attempt of mine at humor. I use irony for humor and it was an ironic twist I felt. Then I realized, no, this is totally inappropriate."

signed a consent-to-search form at 4:20 p.m.

¶ 28    The interrogation continued. By 7:30 p.m. plaintiff was tired and had not eaten. He testified that he had told the detectives everything he knew. Everyone loved his father, and plaintiff could think of no one who might have wanted to hurt his parents. Plaintiff wanted to leave, and the detectives told him that they would not let him go. They continued questioning him.

¶ 29    Plaintiff testified that he told the detectives that he did not call his brother at 10 p.m. on Thursday, April 8, because he did not want him to worry. "That's not the way we did things[,] *** my parents were very private people. They took care of themselves. So no news is good news." Plaintiff also told the detectives that he did not call police on Thursday evening because it was his understanding that he had to wait 24 hours to report a missing person. At most, his parents were missing since Thursday morning, and it was not unusual for them to return home at 10:30 p.m. According to plaintiff, Lowery asked him many questions about the route he took to look for the British nut instead of walking down the middle aisle of the parts room; plaintiff explained to Lowery that he went to look for the British nut in the box containing such pieces; when he did not find one there, he took the quickest path to the second parts room, *i.e.*, through the first parts room. Plaintiff told the officers that he thought his father was killed about 7:30 a.m., because, when his body was discovered, he was wearing boots and a coat he typically wore first thing in the morning.

¶ 30    The questions went into plaintiff's background, including his alcoholism (he had been sober over one month prior to the interview), his first marriage and divorce, his children, living in a commune in Tennessee, et cetera. By 10 p.m., plaintiff had still not eaten and had drunk 15 cups of coffee. Plaintiff testified that he was tired and asked if he could leave; he was told that he could not leave. The detectives told plaintiff that they did not believe his story, and Lowery yelled at him. At this point, plaintiff offered to undergo a polygraph examination. The detectives agreed, and plaintiff signed a consent for them to administer and videotape the examination.

¶ 31    While waiting for the polygraph examiner to come to the station, the questioning became less "intense" or "badgering." The detectives ordered sandwiches, and plaintiff ate a few bites and drank water and coffee. Plaintiff inquired whether polygraphs were reliable and told the detectives that he had read that relaxation or meditation could lower one's blood pressure and affect the test results. Plaintiff told Hendle that he could lower his blood pressure and that he meditates. The polygraph examiner, Kenneth Frankenberry, arrived at midnight. While Frankenberry was preparing plaintiff for the examination, he asked plaintiff if he was aware how his parents had been killed. After plaintiff replied in the negative, Frankenberry told him that their throats had been cut. This was the first time that plaintiff was informed of this.

¶ 32    While Frankenberry was setting up for the examination, plaintiff spontaneously made another "flip" comment, about "voices" (*i.e.*, "I said voices"), and then apologized. Plaintiff was fatigued at this point. He typically went to bed at 10:30 p.m. and almost always before midnight. The examination lasted about one hour. Plaintiff testified that he answered

truthfully.[4] When plaintiff was exiting the examination room, Lowery asked him how he would cut someone's throat. Plaintiff replied that he would "take a knife and grab their head." Plaintiff then just dropped his hands and stopped speaking. They walked back to the interrogation room. When asked how he knew how to cut someone's throat, plaintiff responded that he saw it in a "Rambo" movie. At this point, Lowery and two other officers were in the interrogation room; they asked only a few questions for about 20 minutes. Lowery left and then returned and started questioning plaintiff. Detective Christopher Pandre was introduced to plaintiff. At this point, only Lowery and Pandre were in the room with plaintiff. Hendle returned after 30 minutes and Pandre left.

¶ 33     Plaintiff testified that the questioning became "bizarre" at this time. Hendle told plaintiff that the detectives had a stack of evidence against him; plaintiff stated that Hendle was "crazy," to which Hendle replied that they did have such evidence. Lowery mentioned that plaintiff told Frankenberry that he heard voices and plaintiff replied that Lowery was lying. This "made no sense" to plaintiff. He inquired if he passed the polygraph examination, and Lowery told him that he did not. According to plaintiff, "It made no sense at all." The detectives told plaintiff that they found a bloody knife in his pocket, bloody sheets on his bed, and bloody fingerprints in his bedroom (none of which was true). Lowery again questioned plaintiff about the route he took in the garage. Plaintiff asked when he would be able to view the evidence, and the detectives responded that he could see it on Monday. Plaintiff asked if they were lying, and they replied in the negative and further stated that they could not lie.

¶ 34     Plaintiff testified that he was exhausted and asked to lie down. The detectives told him that he could not do so. Plaintiff asked if he could get help, to which Lowery "explode[d]" and accused plaintiff of "thinking about saving [his] own ass." Lowery yelled at plaintiff and put in front of him two photographs of Morris's and Ruth's bodies. Plaintiff pushed them away. At one point, plaintiff retrieved the photograph of his mother's body and pointed to her clothes, noting that they were not the same clothes she wore when plaintiff last saw her. Also her hair had been pulled back, and Ruth did not wear her hair that way. The interrogation became "very intense." The detectives told plaintiff that they did not believe him and that a 10-year-old "could have done better."

¶ 35     Next, plaintiff testified, "And I asked Detective Hendle, could it be possible that I did this in a blackout? And she said yes, yes. She said this often happens in family members where a person will kill someone in their family and then black it out." Plaintiff continued:

        "I have absolutely no memory of this. They are not letting me go. I don't know what else to do. I said well, what if I construct a hypothetical scenario using the details you

_____

[4]Frankenberry testified that he could not pass plaintiff, because the records were flat. Plaintiff showed signs of fatigue; he yawned throughout the examination. Frankenberry concluded that the results were "[i]nconclusive, inconsistent due to flat polygraph record usually associated with fatigue." Frankenberry believed that plaintiff's answers were "more wrong than right," an impression he conveyed to the detectives. The detectives did not tell plaintiff why Frankenberry could not pass him.

have given me of the crime to try to jog my memory so I can remember what I did because they are saying I did it.

And I said that, and an alarm bell did go off in my mind. I mean wait a minute. Is this really right? But it is like 2:00 in the morning. I want this crime to be solved. I suppose I should have asked for a lawyer then. But if I killed my parents, I want to know about it.

They said they can't lie. I'm not thinking right at all anymore. I'm not. So they agreed with me. They thought it was a good idea if I go through a hypothetical scenario of how I must have killed my parents. Now, the only memories I have of my parents were nothing about murdering my parents. I just had to take details from the past."

¶ 36 Plaintiff then testified that he told the detectives how he would have killed his parents. He would have approached his mother in the trailer, walked up behind her, pulled her hair, cut her throat, and let her fall. When asked if he would have covered her with blankets, plaintiff responded that he could not recall if he did, but, if he did, he would have done so because he cared. He testified that he started to cry after he told the detectives how he would have killed his mother. Plaintiff next told the detectives how he would have killed his father. He would have approached him from behind while Morris was in the garage, pulled back his hair, cut his throat, and let him fall. When the detectives asked plaintiff if his father knew he was there, plaintiff told them that Morris would not have heard him because he was "hard of hearing" (a family trait that plaintiff has inherited). The detectives asked plaintiff what he did with the murder weapon, and plaintiff told them that he would have left it there. Plaintiff testified that, at this point in the interrogation, he was sobbing. Hendle was on his right side and Lowery was on his left. They told him he did it. "I look at Beverly Hendle. I killed my mother. And she looks at me and she says you did it, Gary."

¶ 37 According to plaintiff, Lowery was loud and accusing and Hendle was warm and sympathetic. "And now [Hendle] says you did it, Gary. And I believe her. I believe her." Plaintiff testified that he told the detectives that he had no memory of killing his parents. "Every time I try to get my composure, they say Gary, we see it in your eyes. You killed them. You're telling the truth now."

¶ 38 This line of questioning continued for 1 to 1 1/2 hours. "And now they have me believing I had killed my parents." The questioning then turned to plaintiff's motive. They did not identify a motive. Plaintiff asked Lowery, who carried a pistol on his belt, to remove the gun because plaintiff might grab it and kill himself; Lowery removed the gun. About 2 a.m., on Saturday, April 10, the detectives told plaintiff that the State's Attorney was there and would seek the death penalty. "I didn't care."

¶ 39 At about 5 a.m., Pandre entered the room. He carried a bag with jail clothes in it and told plaintiff that he would be collecting his clothes. Hendle left the room, and plaintiff changed into the clothes that Pandre had brought into the room. The questioning continued, with Pandre asking plaintiff what he did the morning his parents were murdered. According to plaintiff, he was flooded with relief. "I thought oh my gosh, this is all part of the investigation. They are just trying to solve the murder. I didn't kill my parents. It was wonderful." After plaintiff started recounting the events, one of the detectives stated that they

wanted to hear how he killed his parents. Plaintiff then again recounted what he maintained was a hypothetical scenario, but it was not couched in hypothetical terms. However, he added: "I said I can't believe I killed my parents. And I'm not ready to sign a confession because I have no memory of this. I think I did it. I loathe myself. But I have no memory. I won't sign a confession because I don't remember it."

¶ 40    At 10 a.m., plaintiff requested an attorney. He was escorted to the booking sergeant and was subsequently placed in a holding cell.

¶ 41                              2. Defendant Beverly Hendle

¶ 42    Hendle testified that, when she arrived at the farm on Friday, plaintiff was a person of interest because he "was the only surviving member on the farm where his parents had been murdered, and he was our source of information."

¶ 43    Hendle interviewed plaintiff at 1 p.m. and plaintiff was cooperative. She took a telephone call at one point. She did not tell plaintiff that he could not leave. Hendle later learned that plaintiff had gone to the greenhouse and returned. She "thought it was kind of unusual, because his dad has just been found dead and his mother was still missing and I didn't know where he went to." Addressing plaintiff's demeanor, Hendle testified that he drank coffee and "appeared calm."

¶ 44    Plaintiff was placed in the squad car about 1:30 p.m. Hendle testified that plaintiff was not under arrest at this time; he was free to leave, although she was unaware if a person could open the back door of the squad car. Once in the squad car, plaintiff said to Hendle: "Are we going for ridies?" Hendle testified that she said, "What?" and that plaintiff replied: " 'Are we going to Woodstock?' " Hendle stated that plaintiff's comment was "a little startling." Addressing plaintiff's demeanor, she stated that it appeared to be a normal day for plaintiff; he appeared very calm.

¶ 45    Hendle further testified that plaintiff left the car a few times to urinate and to walk around, although she did not write in her report that he walked around. At 3:40 p.m., before they went to the police station, plaintiff was not under arrest; he was free to leave. They arrived at the detective division offices at 4:05 p.m. They drove through a sally port with a garage door that closed behind them. Then, they went to a conference room, which was used for various purposes, including interviewing witnesses and suspects. At 4:15 p.m., plaintiff gave the police written permission to search his property.

¶ 46    At 6:15 p.m., the detectives read plaintiff his *Miranda* rights, to which he initially replied, "Que?" Hendle testified that she thought plaintiff's remark was odd. He then stated that he understood his rights and that he wanted to speak with the detectives without an attorney. Hendle referred to the questioning as an interview and not an interrogation; in her view, the questioning became an interrogation after midnight.

¶ 47    Contrary to plaintiff's testimony, Hendle testified that plaintiff asked to leave only (by way of requesting an attorney) at 10:22 a.m. the next day. He did not ask to leave around 7:30 or 10 p.m. Friday.

¶ 48    According to Hendle, plaintiff did not appear tired the entire night; he was "pretty

talkative." Hendle never asked plaintiff to write out any of his statements or to review and sign the statement. Hendle denied that Frankenberry told her that he could not pass plaintiff because the records were flat, which is usually associated with fatigue. According to Hendle, Frankenberry mentioned fatigue in his written report, which she read weeks later; he did not make any statements to her to that effect on the evening of the examination. Hendle testified at plaintiff's criminal trial that, between 4:15 and 11:30 p.m., plaintiff did not implicate himself in his parents' murders.

¶ 49    Hendle denied that she told plaintiff that she had a stack of evidence against him; that there were bloody clothes in his bedroom; that there was a bloody knife in his pants pocket; that there were bloody sheets in his bedroom; or that there were bloody fingerprints and that his body would not lie. She also denied telling plaintiff that the State's Attorney was in the hallway or mentioning the death penalty.

¶ 50    When plaintiff's clothes were collected at 5:40 a.m. on Saturday and he was given "jail garb" to wear, he was not under arrest. Hendle testified that the jail garb was the only clothing the detectives had to give plaintiff: "That's the only clothing we had available to replace what he had volunteered to give us." Plaintiff was free to leave.

¶ 51    At 5:40 a.m., Hendle left the room. She was gone for about 2 1/2 hours. While Hendle was absent from the room, Pandre and Lowery questioned plaintiff and plaintiff allegedly confessed. At 8:15 a.m., Pandre exited the room and Hendle re-entered; Pandre did not inform Hendle of plaintiff's confession. By 10 a.m., plaintiff did not appear fatigued to Hendle; she testified that he was still very talkative. Hendle testified that plaintiff did not couch his confession in hypothetical terms. He also did not state that he would not sign a confession because he had no memory of killing his parents.

¶ 52    Hendle testified that she did not ask plaintiff if he murdered his parents, what he was going to do with the bodies, or why he stayed on the farm rather than running away. She also did not ask plaintiff why he did not tell Zender that the motorcycle shop was closed. Plaintiff initially told the detectives that the overhead garage door was locked. At another point, he stated that he had not checked it.

¶ 53    According to Hendle, the detectives could not understand why plaintiff did not check the motorcycle shop and the rug trailer late Thursday night; he stated that he checked only the barn. Plaintiff's father typically worked in the shop and his mother typically worked in the trailer. The detectives did not ask plaintiff why he took Zender and Foskus into the shop.

¶ 54    When Hendle signed the criminal complaints against plaintiff, she knew of no physical evidence of the crimes. Hendle testified that there were no bloody fingerprints on the farm; no bloody sheets or clothing; and no bloody knife. Hendle understood that plaintiff had told other detectives that he left a knife in the motorcycle shop.

¶ 55    Hendle addressed the length of plaintiff's interrogation. She stated that, in her experience, she had never had an interview last that long. Plaintiff talked about many subjects, "a lot" of which were irrelevant to the investigation. Plaintiff discussed his life in Texas, various jobs he had held, a wheelbarrow his parents had purchased, his ex-wife and three kids, et cetera.

¶ 56    Hendle testified that she did not lie to plaintiff about the evidence the sheriff's

department had concerning the case. She never raised her voice during the interview, but Lowery raised his voice once or twice. No one ever mentioned a blackout while Hendle was in the conference room. When plaintiff told the detectives that he looked for his parents around 10 p.m. on Thursday, he related that he took a flashlight and checked the barn for his parents' cars. They were located where they were typically stored. According to Hendle, plaintiff stated that he looked "all over" for his parents. When she asked him if he looked in the motorcycle shop, he replied that he did not. When Hendle asked him why, plaintiff did not answer. Similarly, when she asked him if he looked in the rug trailer, plaintiff replied that he did not and he did not explain why. Plaintiff also had stated that he smoked marijuana all day and Hendle testified, "it just seemed odd to me that at his age he didn't know to call somebody to ask about his parents, if they never went away without leaving a note or telling him, and he didn't look in the places closest to the house where they normally are." Plaintiff "was more concerned about his plants than he was looking for his mother."

¶ 57    Plaintiff told the detectives that, Friday morning he did not call any hospitals, his brother or sister, his mother's best friend, or anyone else. Hendle also thought it "odd" that plaintiff retrieved the newspapers and mail and read them for an hour over coffee that morning. Plaintiff further told the detectives that he thought his parents must have been shot in a robbery on their property and that it must have happened between 8 and 9 a.m. on Thursday. He explained that the cat was wet when he saw it sitting on the window sill, and it had been raining–a reference to his parents letting the cat out. As to plaintiff's robbery theory, Hendle testified that it did not appear that anything was missing or disturbed.

¶ 58    Plaintiff described his relationship with his parents. He stated that he felt that his father resented him when plaintiff and his twin sister were born because they took more of his mother's time. Hendle further testified that the polygraph was her idea, but she was not certain of this. By 10 or 10:30 p.m., Hendle was "suspicious." She explained:

> "Just the kind of–the totality of the circumstances. He is the only surviving member of the family left on the farm, and if someone was going to come in and kill his father in the motorcycle shop just north of the house, the mother in the rug trailer just south of the house, didn't appear as anyone came in and disturbed [plaintiff]. The fact that he wasn't looking for his mother. He took his coffee cup and was more concerned about his plants.
>
>     He was kind of flip about the ridies, the que, and he didn't call anybody to look for them, even though it was out of the ordinary for them to go away. Both of their cars were home. He had access to the places they were found, easily, and he didn't have explanations why he didn't check there."

¶ 59    Hendle's testimony concerning the polygraph examination differed in crucial respects from plaintiff's testimony. Hendle testified that plaintiff made "bizarre" statements concerning the test. He agreed to take it and "thought he could beat it, because he meditates and knows how to lower his blood pressure, and he knows all about the galvanic skin response, and I think it was at this time he said he was half Betazoid, which I didn't know what that was. I didn't know about galvanic skin response either, and his hands were already sweaty."

¶ 60    In Hendle's view, after the polygraph, the questioning became an interrogation. The

-12-

detectives attempted to keep plaintiff focused, and the questioning became more aggressive and confrontational. After the detectives (falsely) informed plaintiff that he failed the exam, plaintiff showed emotion for the first time and stated that he could not believe he did not pass; he called Frankenberry a liar. Plaintiff also denied raising his hands and saying "voices" while Frankenberry was setting up.

¶ 61 When asked if plaintiff made a comment about not remembering whether he had killed his parents, Hendle testified: "Yes. He said if he did it, he couldn't remember it." Hendle asked a hypothetical question concerning how someone would kill his parents, and plaintiff gestured in response by lifting his hands. She did not record his response as a confession, but she did not interpret plaintiff's response as hypothetical.

¶ 62 The detectives asked plaintiff if he would submit his clothes to the crime lab because they noticed a stain on his pants. He consented, and the detectives retrieved the jail garb (not an orange jumpsuit worn by a prisoner).

¶ 63 When Hendle returned to the interrogation room at 8:15 a.m., Lowery filled her in on his and Pandre's conversation with plaintiff:

"[Lowery] said that [plaintiff] had said he killed his mother first, because she was the closest, I believe, and that she would–she wouldn't be alarmed by his presence in the rug trailer. He had looked out the window and seen her in the rug trailer, and she wouldn't be alarmed by his presence, because she knows and trusts him, and that he had come up behind her and cut her throat, but he laid her down gently, because that would mean he cared, and I believe there was some discussion about her being covered with rugs or blankets.

And then he said he had gone out to the motorcycle shop and came up behind his dad who was walking away from him and cut his throat, and I can't recall anything further at this time."

During Lowery's recap, plaintiff did not state that what Lowery was recounting was not true or did not occur. He did not state that he would not sign a statement. Lowery left the room and returned with breakfast and left again.

¶ 64 At some point after Hendle returned to the interrogation room, plaintiff began sobbing. He asked why he would "do this." He stated that he did not understand why he would kill the people who meant the most to him, and he wondered if he was "afraid of success." Lowery returned to the room at 10 a.m., and plaintiff stated " 'I killed my parents.' " The conversation continued, and, at 10:22 a.m., plaintiff requested an attorney.

¶ 65 During the interrogation, Hendle was unaware that Morris had sustained two slash wounds, that he had been stabbed, that he had three injuries to his head, and that his skull had been fractured. She was also unaware that Ruth had sustained three slash wounds to her throat, that her head had been hit, that her skull was fractured, and that she had seven injuries to her head.

¶ 66                                        3. Defendant Eugene Lowery

¶ 67 Lowery testified that, at the sheriff's station, the detectives read plaintiff his *Miranda*

rights, but he was not under arrest. Plaintiff never asked to leave at any time during the interview. During the interview, plaintiff made references to the Bible. Lowery wrote in his notes, "Jesus Freak." He explained that it was a notation to remind him to ask plaintiff further questions. Lowery testified that plaintiff never appeared tired or fatigued; he never saw plaintiff yawn. Lowery could not recall if Frankenberry told him and Hendle that plaintiff yawned throughout the polygraph. Frankenberry did not mention fatigue.

¶ 68    When Hendle told plaintiff that he had not passed the polygraph examination, plaintiff was upset; he did not believe that he had not passed. Lowery did not necessarily want plaintiff to think he had failed, but he wanted to get a response from plaintiff because he had been "emotionless" all night. Lowery concurred with Hendle that, up to the polygraph, the questioning was more in the form of an interview than an interrogation. The questioning became more confrontational after the polygraph. Lowery raised his voice at least once during the postexam questioning.

¶ 69    Lowery denied that he told plaintiff that there was a lot of physical evidence at the scene. He also denied telling plaintiff that the polygraph machine does not give false results. Lowery further denied that he told plaintiff that he could not lie to him. He denied stating to plaintiff, "how could you kill your mother?" After the polygraph and until about 5:40 a.m. on Saturday, the interrogation to a great extent covered the same ground. The Gauger farm was about 20 minutes from the interview location. Lowery testified that he could have sent Pandre to the farm to pick up a set of clothes for plaintiff to change into, but he did not. Plaintiff was given jail garb to wear.

¶ 70    Between 5:40 and 8:15 a.m., Hendle was absent from the interview room and Pandre was present. Lowery did not see signs of fatigue in plaintiff even though plaintiff had been awake for over 20 hours. Lowery was tired. Plaintiff gave a confession during this time, specifically, "an account that it was like living it at that time." He also made a slashing motion when he described each of the murders. Lowery denied that plaintiff ever stated that he was not going to sign a confession because he had no memory of committing the murders. Lowery denied that the detectives tried to cover up anything that occurred during the interview by creating only a single report of it.

¶ 71    Addressing the absence of any recording of plaintiff's interrogation, Lowery explained that the department did not have a video camera in 1993, though he conceded that the detectives could have obtained a tape recorder to audiotape the interview; they chose not to. The detectives could have called a court reporter, although it was not their practice to do so. The detectives chose not to take plaintiff's written statement. Lowery explained:

"[Lowery]: I don't know if it was so much chose. We didn't at the time, and if we may have had the opportunity to talk a little longer and worked out some more details in that confession, we might have offered, but we did not at the time.

Q. If you may have had a chance to talk longer you might have done it, is that your testimony?

A. Absolutely."

Lowery had previously taken written statements. When asked if there was anything about plaintiff that suggested he would not have signed a written statement, Lowery stated that

there was nothing, except for the fact that he was very upset. According to Lowery, at no point did plaintiff couch any statement in hypothetical terms.

¶ 72    About 8:15 a.m. on Saturday, Lowery left the interrogation room and Hendle returned. Lowery returned at 8:45 a.m. with breakfast, left again, and then returned at 10 a.m. Only Hendle and plaintiff were in the room. Plaintiff was crying and hanging on to Hendle. Plaintiff stated: " 'I killed my parents.' " He did not appear fatigued, but he did appear very emotionally distressed.

¶ 73    Addressing plaintiff's statements concerning the discovery of his father's body, Lowery testified that he thought it "odd" that plaintiff (leading Zender and Foskus) did not take the most direct route to the motorcycle parts area; plaintiff had said that instead of walking down the first aisle, where an obstruction was present, he led the visitors down the center aisle, which was farther away from the parts area and from where Morris's body was located. Lowery further testified that his observations of Morris's body and the surrounding area indicated to him that there was no struggle. There were no signs of forced entry into the garage or the rug trailer. Lowery was at the scene for about a half-hour; he arrived at the farm at 3:17 p.m. Before he left, the sheriff told Lowery that plaintiff stated to the 911 operator that his father had been dead for about one day.

¶ 74    During the interview, it did not appear to Lowery that plaintiff was in shock. He never asked to leave. When the interview commenced, plaintiff was not a suspect. After the polygraph, the questioning became an interrogation. The detectives did not suspect a burglary or similar crime; plaintiff told them during the interview that there were about 6 to 12 guns in the house. (Presumably, the guns were not missing.) Lowery testified that plaintiff spoke in very positive terms about his mother, but was "more negative" about his father. Plaintiff stated that it was a good day when he did not have to see his father before he went to the greenhouse and started work.

¶ 75    When plaintiff awoke on Thursday, April 8, 1993, he noticed that the dishes from the previous evening's dinner had not been washed, contrary to his mother's custom, that the beds had not been made, and that there were no signs that anyone had eaten breakfast that morning. Plaintiff stated that his parents had previously left the farm without leaving a note.

¶ 76    According to Lowery, plaintiff told the detectives that he looked everywhere for his parents (beginning about 10:30 p.m. Thursday), but he had no answer when they specifically asked him if he looked in the most likely places his parents would be: the motorcycle shop and the rug trailer. Plaintiff's explanation of the light on in the motorcycle shop "varied." On the one hand, it was unusual for the light to be on; on the other hand, it was left on for security reasons. On Thursday, plaintiff smoked marijuana all day; he said that it was all a blur. Lowery did not know if plaintiff's efforts to locate his parents were "genuine." He explained that plaintiff did not wake up until 9 a.m. on Friday. Lowery was concerned that plaintiff stated that he picked up the mail and newspapers (several days' worth) and put up the chain. Plaintiff had stated that, if the chain was down, his parents were home and, if it was up, they were gone. Plaintiff made no phone calls trying to locate his parents.

¶ 77    Lowery's analysis was that, given that there were no signs of intruders and nothing was missing, either the Gaugers were surprised by their attackers or they were familiar with their

attackers. Lowery also found it odd that any potential robber or burglar did not also search the farmhouse either to take something or to ensure that nobody witnessed the crimes. When they discussed a polygraph, Lowery was disturbed when plaintiff stated that he thought he could "beat" the exam.

¶ 78    In Lowery's view, the questioning turned into an interrogation and became more confrontational after the polygraph because the detectives wanted more details from plaintiff. Lowery denied ever asking plaintiff in the hallway how he would have killed his parents. Rather, Hendle asked how someone could kill plaintiff's parents, although Lowery conceded that, in her report, Hendle wrote that Hendle asked "how someone would do that." At this point, plaintiff made a motion with his hands: he raised his left hand and made a fist and started to raise his right hand; he then put down his arms.

¶ 79    Lowery denied that he told plaintiff that the police had bloody clothes, a bloody knife, or bloody sheets; it would have been a "huge mistake." He explained that the detectives did not know what had been discovered at the crime scene; it would have been a "horrible risk" to attempt to "bluff" plaintiff. Plaintiff stated that, if he killed his parents, he did not remember it.

¶ 80    Initially, plaintiff did not want to see the photographs of his parents' bodies, but he later viewed the photographs. Lowery denied that he stood up and slammed the photographs onto the table in front of plaintiff and yelled something at him. Rather, he opened a file folder and laid them in front of plaintiff. Plaintiff did not show any emotional reaction or shock. Plaintiff commented that his parents were wearing outdoor clothing.

¶ 81    The rug trailer was 30 feet from plaintiff's bedroom. This aspect "bothered" Lowery because plaintiff claimed that he did not hear anything. Plaintiff never asked to use the telephone in the interview room. When Pandre entered the interview room with jail garb, Lowery did not intend to charge plaintiff with the murders, because the detectives did not have probable cause to believe that plaintiff committed the crimes.

¶ 82    Plaintiff began his confession after Pandre told him that the detectives were not there to judge him. Plaintiff stated that he did not recall if he covered up his mother's body with blankets after he killed her and he did not recall if he locked the trailer. Plaintiff also stated that, if he did cover up his mother, that would have meant that he cared for her.


¶ 83                    4. Defendant Christopher Pandre

¶ 84    Pandre testified that he saw plaintiff in the interview room for a few minutes about 12:30 a.m. on Saturday, April 10, and then was present in the room between 5:40 and 8:15 a.m. Plaintiff did not appear tired. The detectives gave plaintiff jail clothes (about 5:40 a.m.) before he allegedly confessed (about 7 or 7:30 a.m.). According to Pandre, he could not have retrieved clothes for plaintiff from the Gauger farm because it was a crime scene and was on lockdown.

¶ 85    Pandre denied yelling at plaintiff during the interrogation. When the detectives asked plaintiff why he killed his parents, plaintiff explained that he believed he was a "dredge" on them and that they were always taking care of him. This explanation was not included in the detectives' report.

-16-

¶ 86                          5. Other Witnesses

¶ 87    Ginger Blossom, plaintiff's sister, testified that, some time after the murders, she met Hendle at the farmhouse. Hendle told Blossom that, to assist people in talking, detectives sometimes ask suspects hypothetical questions about how they would have killed someone.

¶ 88    Ed Zender testified that, when he and Foskus drove up to the Gauger farm on the day the Gaugers' bodies were discovered, the gate at the end of the driveway was closed and the chain was up (he parked his truck on the side of Route 173). Plaintiff told him that he had not seen his parents for two days and thought this was unusual. Plaintiff thought that they might be out of town with Windy. Plaintiff did not hesitate to take Zender into the motorcycle shop. Describing the room they walked through immediately before they discovered Morris's body, Zender testified:

> "There is only one window in there, but it is on the other end where there's not much light with all the shelving in the way. [Plaintiff] had started to go down one row that was right through the doorway. I believe it was too cluttered with things so we backed up and moved over to the next row to walk down the middle part there.

> From there, we walked to the end. And you come to a dead end in that aisle. You have to turn right and go up a step and then turn left to go into the next room where we were going."

Once they went up the step, they discovered Morris's body. Plaintiff appeared worried and asked for a hug. He was concerned for his mother and inquired about her several times. As to his father, plaintiff speculated that he might have tripped over something in the aisles. According to Zender, the aisles were cluttered.

¶ 89    Zender further testified that he, Foskus, and plaintiff looked for Ruth. Zender looked through a window into the rug trailer, and plaintiff checked one of the barns.

¶ 90    Dr. Larry Blum, the pathologist who conducted the autopsies of the Gaugers' bodies after plaintiff had been charged, testified that Morris sustained blunt force injuries to his scalp, a stab wound to his back, and at least two starting points for the neck wound. Ruth sustained blunt force trauma to her head, and the slash wound on her neck was caused by at least three cuts. Dr. Blum stated that he did not find any signs of defensive struggle on either body.


¶ 91                 6. Verdict and Subsequent Proceedings

¶ 92    On August 20, 2009, the jury returned a verdict and answered special interrogatories in defendants' favor on all claims.[5] On August 20, 2009, the court entered judgment on the verdict. On March 1, 2010, the court denied plaintiff's motion for a new trial. Plaintiff appeals.

---

[5]The answers included that, when they initiated criminal proceedings against plaintiff: (1) each detective had probable cause to believe that plaintiff committed the charged offenses; and (2) none of the detectives acted with malice.

¶ 93                                     II. ANALYSIS

¶ 94                          A. Plaintiff's Statement of Facts

¶ 95        Preliminarily, we address defendants' request that we strike portions of plaintiff's statement of facts for being in violation of Illinois Supreme Court Rule 341(h)(6) (eff. March 16, 2007) (appellant's statement of facts "shall contain the facts necessary to an understanding of the case"). They argue that plaintiff's statement of facts presents a skewed version of the relevant facts by citing only, with one exception, to his own testimony; that he ignores all testimony that contradicts his own; and that he omits portions of his own testimony that do not favor him. Although we agree that plaintiff's statement of facts violates the rule, we reject defendants' request to strike and instead will ignore those portions that provide an incomplete version of the events. Given that we possess and have reviewed the record and defendants' statement of facts, our review of the appeal is not hindered. *Budzileni v. Department of Human Rights*, 392 Ill. App. 3d 422, 440-41 (2009) (declining to strike brief).

¶ 96             B. Probable Cause–Exclusion of Appellate Court Order

¶ 97        Turning to the merits plaintiff argues first that the trial court erred in excluding from evidence our March 8, 1996, Rule 23 order that reversed plaintiff's conviction in his criminal trial. He argues that exclusion of the order tainted the jury's evaluation of probable cause. Plaintiff raised several alternative bases for admission of the order: (1) the law-of-the-case doctrine; (2) collateral estoppel; and (3) relevance. For the following reasons, we conclude that the trial court did not err in excluding the Rule 23 order from evidence.

¶ 98        The trial court is in the best position to make decisions regarding the admission of evidence. *People v. Slater*, 228 Ill. 2d 137, 151 (2008); *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1042 (2008). We review evidentiary rulings for an abuse of discretion. *Porter v. City of Chicago*, 393 Ill. App. 3d 855, 857 (2009). A trial court abuses its discretion where no reasonable person would take the view adopted by the court. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 176-77 (2003).

¶ 99        To establish malicious prosecution, a plaintiff must show: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) that the proceeding terminated in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages. *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996). The failure to establish any one of the foregoing elements precludes recovery for malicious prosecution. *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 641 (2002).

¶ 100       Plaintiff moved *in limine* to admit our Rule 23 order, arguing that the order was the law of the case and was definitive as to whether there was probable cause to arrest plaintiff absent defendants' assertions that he confessed and, thus, it was relevant to a key element of plaintiff's malicious-prosecution claim. In the order, we held that, when the officers originally took plaintiff in for questioning, they placed him in custody but lacked probable cause to do so; there was no probable cause until plaintiff made incriminating statements at the police station. *Gauger*, slip order at 27-28. We further held that plaintiff's incriminating statements should have been suppressed because they constituted the fruits of the illegal

-18-

arrest. *Id.* at 29.

¶ 101    Defendants responded below by arguing that the law-of-the-case doctrine does not apply to a judgment reached in a separate and distinct proceeding. Although they conceded that the facts in the two cases overlapped, they asserted that the matters were nonetheless separate and contained different legal issues, parties, and standards of proof. Addressing probable cause, defendants argued that the issue in the criminal case was not identical or relevant in the civil case. Thus, they urged that probable cause in the criminal case was not going to be relitigated in the civil suit, because the precise issue was not the same. Defendants noted that we determined that there was no probable cause to *arrest* plaintiff. Defendants argued that plaintiff's current suit alleged not *false arrest*,[6] but only *malicious prosecution*, which involves assessing whether probable cause existed when plaintiff was *charged*. In this regard, defendants urged, the Rule 23 order was limited to determining probable cause to arrest and did not address whether there was probable cause to institute or continue criminal proceedings against plaintiff.

¶ 102    On August 7, 2009, the trial court denied plaintiff's motion *in limine* (ruling that the Rule 23 order was inadmissible), unless defendants opened the door to such evidence. (The record on appeal contains no transcript of any hearing on that date.)

¶ 103    During trial, after Lowery testified, plaintiff's counsel noted to the trial judge that both Hendle and Lowery had testified that plaintiff was not under arrest when he was at the police station. He requested that a stipulation be read to the jury that, based on the Rule 23 order, defendant *was* actually under arrest. Defendants' counsel objected, noting that *plaintiff's* counsel opened the door by asking questions concerning whether plaintiff was under arrest. The trial court agreed and denied plaintiff's counsel's request. The court noted that it was denying his request because: (1) plaintiff's counsel himself opened the door to address something the court had already excluded via a prior ruling; (2) the law-of-the-case doctrine did not permit its entry, as the appellate court did not rule on precisely the same issue; and (3) granting the request could confuse the jury "as to what all this meant, as opposed to what they knew and did at a certain point in time." The court invited plaintiff to submit case law supporting his argument.

¶ 104    Plaintiff raised the issue again in his posttrial motion. At the hearing on the motion, plaintiff's counsel argued that the Rule 23 order held that there was no probable cause until plaintiff's alleged confession, and the arrest and the charges were not so attenuated in time as to make the order irrelevant or confusing to the jury. Plaintiff's counsel also argued that, as to relevance, the order would have informed the jury that, during the great bulk of the time that plaintiff was questioned, there was no probable cause, and thus the jury would have been

---

[6]False arrest or false imprisonment is the unlawful restraint of an individual's personal liberty. *Lappin v. Costello*, 232 Ill. App. 3d 1033, 1041 (1992). The elements of false arrest "are that the plaintiff was *restrained or arrested* by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." (Emphasis added.) *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 474 (1990). "If probable cause existed *for the arrest*, an action for false arrest cannot lie." (Emphasis added.) *Lappin*, 232 Ill. App. 3d at 1041.

better able to focus on the central issue–whether plaintiff confessed. Counsel urged that, whether the order was admitted as law of the case or via estoppel, the jury should have been able to make its probable-cause findings with the knowledge that plaintiff was under arrest when he was put in the squad car at the farm, especially in considering the parties' credibility. He further urged that plaintiff suffered prejudice as a result of the jury evaluating probable cause based only on the trial testimony.

¶ 105    In denying plaintiff's motion for a new trial, the court noted that the Rule 23 order focused on whether there was probable cause *to arrest*, whereas the focus of the malicious-prosecution suit was probable cause *to initiate the proceedings*. Thus, the issues were different. The court reiterated that it would have been confusing for the jury to hear that there was no probable cause for plaintiff's arrest until his confession. Further addressing juror confusion, the court noted that the Rule 23 order also addressed, for double jeopardy purposes, whether there was sufficient evidence at the criminal trial to prove defendant's guilt beyond a reasonable doubt. *Gauger*, slip order at 29-30. The trial judge stated that this issue would also have confused the jury and that it was not an issue in the civil suit. (Plaintiff sought to introduce the entire Rule 23 order.)

¶ 106    On appeal, plaintiff argues first that the law-of-the-case doctrine applies here given the "nearly total overlap" of the probable cause issue in both the criminal and the present proceedings and given the nearly identical parties and interests in both proceedings.[7] Plaintiff contends that defendants were allowed to relitigate a critical aspect of probable cause and to encourage the jury to reach a different conclusion about the issue. Thus, excluding the Rule 23 order undermined our authority and invited inconsistent results. Plaintiff, for example, takes issue with defendants' closing arguments, noting that they focused on evidence of probable cause from events before the disputed morning hours of April 10, 1993. He notes that these were the same facts that we had addressed and held did not constitute probable cause.

¶ 107    The law-of-the-case doctrine provides that "where an issue has been litigated and decided, a court's unreversed decision on that question of law or fact settles that question 'for all subsequent stages of the suit.' " *Pekin Insurance Co. v. Pulte Home Corp.*, 344 Ill. App. 3d 64, 69 (2003) (quoting *Norton v. City of Chicago*, 293 Ill. App. 3d 620, 624 (1997)). There are two exceptions to the doctrine: (1) where a higher reviewing court subsequently issues a contrary ruling on the same issue; and (2) where the lower reviewing court, after remanding the case for a new trial on all issues, determines that its prior decision was palpably erroneous. *Alwin v. Village of Wheeling*, 371 Ill. App. 3d 898, 911 (2007). Unlike collateral estoppel, which we discuss below, the law-of-the-case doctrine applies to issues that were already determined in the same case. *People v. Tenner*, 206 Ill. 2d 381, 396 (2002).

¶ 108    The law-of-the-case doctrine has no application here. The present lawsuit is a civil case and is thus distinct from plaintiff's criminal case. Although the two proceedings involved

---

[7]Although he addressed this issue in his briefs to this court, plaintiff essentially conceded at oral argument that the law-of-the-case doctrine does not apply here. We nevertheless address it, as it is briefly disposed of.

similar facts, the legal issues, standards of proof, and parties were different.

¶ 109    *Alwin v. Village of Wheeling*, 371 Ill. App. 3d 898 (2007), upon which plaintiff relies, is inapposite. *Alwin* involved an airplane crash and a subsequent wrongful-death and survival suit against several municipal defendants and the plane's owner. In a prior appeal, the appellate court held that the municipal defendants owed the plaintiffs a duty of care (to maintain a public airport in a reasonably safe condition) and that the municipal defendants were not immune from liability under a tort immunity statute. *Id*. at 905, 912; see also *Anderson v. Alberto-Culver USA, Inc.*, 317 Ill. App. 3d 1104, 1112, 1117 (2000). The *Alwin* court rejected the municipal defendants' argument that the law-of-the-case doctrine did not apply, concluding that the issues of duty and immunity were previously decided and were the law of the case and therefore binding. *Alwin*, 371 Ill. App. 3d at 913-14 (rejecting arguments that doctrine did not apply where the previous decision dealt with summary judgment and that two exceptions to doctrine applied). Thus, the municipal defendants were precluded from asserting that the prior appeal was wrongly decided. In contrast, plaintiff here seeks, in a different case and with different parties, to assert that the Rule 23 order from his criminal case was the law of the case in the present civil suit.

¶ 110    Plaintiff further complains that the jury was not allowed to consider the fact that he was placed under arrest at the farm and remained under arrest throughout his interrogation. In his view, the jury was not allowed to consider this fact as part of the totality of the circumstances. He notes that this situation was made worse by defendants' testimony that plaintiff was not under arrest during his interrogation and that he was free to leave right up to the time he made the incriminating statements. This testimony, plaintiff argues, was in contravention of the Rule 23 order as to the issue of arrest, and he notes that it was during this testimony that his counsel again moved to admit the order. Plaintiff asserts that our authority was undermined by allowing the jury to draw its own conclusions about whether plaintiff was under arrest and by allowing defendants to testify that plaintiff was free to leave. Further, he contends that the jury was deceived and that its evaluation of probable cause was tainted. We reject plaintiff's argument.

¶ 111    Initially, we reject plaintiff's complaint concerning defendants' testimony that plaintiff was not under arrest during his interrogation and that he was free to leave right up to the time that he made the incriminating statements. As previously noted, it was *plaintiff's* counsel who questioned the detectives on this issue. Thus, as the trial court noted in denying plaintiff's request to admit the Rule 23 order, plaintiff's counsel himself opened the door to address something that the court had excluded via a prior ruling.

¶ 112    Second, we note that, in assessing probable cause to *arrest*, the existence of probable cause depends on the totality of the circumstances at the time of the arrest. See, *e.g.*, *People v. Love*, 199 Ill. 2d 269, 279 (2002). The determination is based on facts known to the police at the time of the arrest. *People v. Chapman*, 194 Ill. 2d 186, 217 (2000); see also 725 ILCS 5/107–2(1)(c) (West 2008) (peace officer may make warrantless arrest when the officer "has reasonable grounds to believe that the person is committing or has committed an offense"). The existence of probable cause in a malicious-prosecution action is "determined by looking to what the defendants knew at the time of subscribing a criminal complaint" and not at the (earlier) time of arrest. *Porter v. City of Chicago*, 393 Ill. App. 3d 855, 868-69 (2009). In a

-21-

malicious-prosecution case, probable cause is defined as "*a state of facts* that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." (Emphasis added.) *Fabiano*, 336 Ill. App. 3d at 642. "It is the state of mind of the person commencing the prosecution that is at issue–not the actual facts of the case or the guilt or innocence of the accused." *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (2006). Errors that are not grossly negligent do not affect the probable cause inquiry when the complainant has an honest belief that the accused is probably guilty of the offense. *Id*. at 654-55. The issue in the present lawsuit was whether defendants had probable cause to charge plaintiff on April 10, 1993. The Rule 23 order addressed probable cause to arrest, which is a different issue, as plaintiff acknowledges. We agree with defendants that the Rule 23 order's conclusion that before plaintiff made incriminating statements there was no probable cause to arrest did not mean that the events leading up to the statements could not be considered in conjunction with plaintiff's statements in determining whether there was probable cause to prosecute. *Cf. People v. Strauser*, 146 Ill. App. 3d 128, 132 (1986) (law-of-the-case doctrine and collateral estoppel did not apply to preclude trial court from hearing the defendants' motions to suppress evidence; earlier appellate court decision addressed *probable cause for the issuance of a search warrant* in context of addressing two motions to quash the search warrant, whereas the cause at issue concerned *probable cause to arrest*).

¶ 113        Next, we address plaintiff's claim that collateral estoppel warranted admission of the Rule 23 order. Preliminarily, we note that it was defendants, not plaintiff, who first raised collateral estoppel at trial. Plaintiff addressed collateral estoppel only in his reply to defendants' arguments, including in his reply on his posttrial motion. Thus, plaintiff has arguably forfeited this argument. See *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540, 546 (2008) (to preserve an issue for appeal, an objection must be made at trial and the issue must be raised in a posttrial motion); see also *Midwest Physician Group, Ltd. v. Department of Revenue*, 304 Ill. App. 3d 939, 952 (1999) (where collateral estoppel is not raised at trial, issue is forfeited for review). However, given that the trial court made findings on this issue, we choose to briefly address it.

¶ 114        Collateral estoppel (or issue preclusion) is an equitable doctrine that, like the law of the case doctrine, prevents a party from relitigating an issue that has been decided in a prior proceeding. Collateral estoppel applies when: (1) the issue decided in the prior adjudication is identical to the issue in the present suit; (2) a final judgment was entered on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party to or in privity with a party to the prior adjudication. *Talarico v. Dunlap*, 177 Ill. 2d 185, 191 (1997). Application of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment. *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 467-68 (1996). A judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined and not as to other matters that might have been litigated and determined. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389-90 (2001). "It is axiomatic that circuit courts have broad discretion to ensure that application of offensive collateral estoppel is not fundamentally unfair to the defendant, even though the threshold requirements for collateral estoppel are otherwise satisfied." *Preferred Personnel*

*Services, Inc. v. Meltzer, Purtill & Stelle, LLC*, 387 Ill. App. 3d 933, 945 (2009).

¶ 115 We reject plaintiff's claim that collateral estoppel applies here. The issue addressed in the Rule 23 order–probable cause to arrest–is not identical to the issue in the present lawsuit–probable cause to prosecute. A party asserting "collateral estoppel bears the 'heavy burden' of demonstrating with clarity and certainty what the prior judgment determined. [Citations.]" *Peregrine Financial Group, Inc. v. Martinez*, 305 Ill. App. 3d 571, 581 (1999). For the doctrine to apply, " 'it must conclusively appear that the fact must have been so in issue that it was necessarily decided by the court rendering the prior judgment. If there is any uncertainty because more than one distinct issue of fact is presented to the court, the estoppel will not be applied.' " *Id.* (quoting *Betts v. Manville Personal Injury Settlement Trust*, 225 Ill. App. 3d 882, 926 (1992)). Here, clearly the central issue in the Rule 23 order was not whether there was probable cause to prosecute, but whether there was probable cause to arrest. As previously noted, probable cause to arrest depends on the totality of the circumstances at the time of the arrest and is based on the facts known to the police at that time. *Love*, 199 Ill. 2d at 279 (the facts known to the officer at the time of arrest must be sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime). In contrast, in assessing probable cause in a malicious-prosecution case, we look to what the defendants knew when they commenced the prosecution (*i.e.*, subscribed the criminal complaint). *Porter*, 393 Ill. App. 3d at 868. Therefore, collateral estoppel does not apply. *Cf. Strauser*, 146 Ill. App. 3d at 132 (rejecting collateral-estoppel and law-of-the-case doctrines where previous issue concerned probable cause for the issuance of a search warrant and current issue concerned probable cause to arrest).

¶ 116 Next, plaintiff argues that the Rule 23 order was relevant to the issue of defendants' lack of probable cause to prosecute, and he urges that its exclusion from evidence unfairly prejudiced him. See, *e.g.*, *In re Kenneth J.*, 352 Ill. App. 3d 967, 980 (2004) (evidence must be relevant to be admissible). Plaintiff contends that the Rule 23 order would have: (1) instructed the jury as to what precisely did *not* constitute probable cause; (2) provided evidence of defendants' lack of probable cause to prosecute before plaintiff's incriminating statements; and (3) assisted the jury in understanding that the existence of probable cause to prosecute turned on whose account of the events of April 10, 1993, was more credible. According to plaintiff, the Rule 23 order clarified that there was no probable cause to prosecute plaintiff absent the incriminating statements made on the morning of April 10, 1993, and, therefore, the order bore directly on a key element of plaintiff's malicious-prosecution claim and should have been admitted. Plaintiff further argues that the order was neither irrelevant nor confusing for not completely disposing of the probable cause issue–that is, for leaving the jury to decide whether a confession was made on April 10, 1993. He asserts that our holding as to what did not constitute probable cause and our roadmap of what any probable cause finding in this case had to turn on (*i.e.*, the making of incriminating statements) were relevant and not confusing. In plaintiff's view, the order would have assisted the jurors in understanding where the probable cause "bar" was set in this case.

¶ 117 Again, we reject plaintiff's claim. The trial court did not abuse its discretion in finding that the Rule 23 order would likely have confused the jury, and we do not believe that plaintiff was prejudiced by the ruling. The distinctions between the concepts of arrest and

prosecution can reasonably be viewed as confusing to a lay juror. As defendants note, had the Rule 23 order been admitted, it is reasonable to predict that the jury would have been confused by the import of our: (1) holding that there was no probable cause for plaintiff's arrest until his incriminating statements on April 10, 1993; and (2) conclusion on the sufficiency-of-the-evidence issue. Plaintiff's assertion that the Rule 23 order clarified that there was no probable cause to prosecute him absent and until the incriminating statements on the morning of April 10, 1993, is not well taken. Plaintiff contends that the focus of the probable-cause-to-prosecute issue in the present lawsuit was whether the incriminating statements were actually made. Instead, according to plaintiff, the jury was "encouraged" to revisit certain facts that we held in the Rule 23 order did not constitute probable cause, including the quality of plaintiff's detective skills as he searched for his parents and the appropriateness of his emotional responses to the unfolding events. We reject plaintiff's claim, because the Rule 23 order did not assess the parties' credibility. Plaintiff's claim that he was prejudiced by the ruling because the jury never heard that he was under arrest throughout the interrogation is not well taken because whether he was under arrest had no bearing on whether there was probable cause to prosecute him.

¶ 118    In summary, the trial court did not abuse its discretion in excluding the Rule 23 order.[8]

¶ 119                              C. Malice–"Real Killers" Evidence

¶ 120    Next, plaintiff argues that the trial court erred in excluding evidence showing how the: (1) murders were committed; and (2) "real killers" were discovered. He urges that this evidence was critical to his ability to show malice. For the following reasons, we reject plaintiff's argument.

¶ 121    Prior to trial, plaintiff moved *in limine*: (1) to bar Ignasiak's testimony and any references to his conversations with Miller (concerning how the "farmer's son" paid Miller to kill the Gaugers); and (2) to admit Schneider's testimony and wiretap recordings of Schneider and Miller (on the basis of the recordings, both men were charged with the Gauger murders). Plaintiff also requested a stipulation regarding how his innocence was established. Defendants' relevant motions *in limine* sought to bar all evidence of actual innocence, other than the Governor's pardon. The trial court: (1) granted plaintiff's motion to bar Ignasiak's testimony and any references to his alleged conversations with Miller; (2) denied plaintiff's motion to admit Schneider's testimony and the wiretap recordings of Schneider and Miller; and (3) barred any evidence relating to the Outlaw investigation.[9] Also, the parties agreed to the following stipulation: "The criminal case against [plaintiff] terminated in his favor, on the merits, and he was pardoned based on his actual innocence. In June of 1997, the two

_____

[8]We express no opinion herein concerning the admissibility of the Rule 23 order in the context of any false arrest/false imprisonment claim that plaintiff may have pursued, because prior to trial, the court granted summary judgment in defendants' favor on that count.

[9]Thus, defendants could not introduce evidence of their investigation after plaintiff was charged shortly after 10 a.m. on April 10, 1993, with the exception of the pathologist's testimony.

killers were apprehended."[10]

¶ 122    The malice element of malicious prosecution may be proved "by showing that the prosecutor proceeded with the prosecution for the purpose of injuring plaintiff or for some other improper motive." *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 97 (2008). Malice may be inferred from a lack of probable cause only where there is no credible evidence that refutes that inference. *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 77 (2003).[11]

¶ 123    1. Exclusion of Evidence of How the "Real Killers" Committed the Crimes

¶ 124    Plaintiff argues first that the jury should have been permitted to consider the evidence of how the "real killers" committed the crimes (the Outlaw evidence) and that the jury could have concluded that it supported plaintiff's position that defendants knowingly fabricated his alleged confession and, therefore, acted with malice. He notes that his theory of malicious prosecution was that, over 18 hours of interrogation, defendants "fed" him facts that he eventually recited to them while also maintaining that he had no memory of killing his parents. Plaintiff contends that, based solely on the manufactured statements (and leaving out important facts, including the statements' hypothetical nature and plaintiff's lack of memory of the events they described), defendants initiated criminal proceedings against him. Plaintiff urges that evidence of the details of the "actual" crimes, through the Outlaw evidence, is important. Specifically, he notes that Schneider and Miller explained how they committed the murders, including details that only the true killers would know. They specified the time they arrived at the farm; how Ruth was killed (by first being hit over the head and then having her throat slashed several times); how Morris was killed (by head blows and multiple slash wounds to the throat); how the bodies were positioned; how Miller stabbed Morris in the side; and the measures they took to leave no physical evidence. Plaintiff argues that the details Schneider and Miller provided give credence to plaintiff's theory that defendants manufactured his statements because key details were missing from his statements and plaintiff provided only details that he learned from defendants. He notes that he never mentioned any injuries to his parents' heads, nor did he state that their throats were slashed multiple times. Plaintiff also notes that he did not mention a knife wound to Morris's side.

---

[10]Also, the jury was instructed that "the criminal proceeding was terminated in favor of [plaintiff] on the basis of his innocence" and that this element of malicious prosecution had been proved and need not be considered by the jury.

[11]On malice, the jury was instructed as follows:
    " 'Malice' is defined as the intent, without justification or excuse, to commit a wrongful act. Malice is proved by evidence or reasonable inferences drawn from the evidence that the prosecution was set in motion as a result of improper motive. An improper motive for a prosecution is any reason other than bringing the party to justice. The term malice is not limited to personal ill-will, spite, or hatred toward plaintiff. Instead, malice may be inferred from the absence of probable cause, if the circumstances surrounding the commencement of the criminal proceeding are inconsistent with good faith and if the absence of probable cause has been clearly proved."

-25-

In plaintiff's view, a jury could have found that he did not mention these details because defendants had no knowledge of them; that is, where defendants were not aware of these details, they could not have suggested them to plaintiff.

¶ 125　　We begin our analysis by reviewing *Aguirre* and *Porter*, the two cases upon which the parties rely. In *Aguirre*, three plaintiffs sued a municipality and six police officers, alleging that the defendants maliciously prosecuted them for kidnapping and murder. A jury returned a verdict in the plaintiffs' favor, and the defendants appealed, arguing that the trial court abused its discretion in admitting the testimony of the confessed murderer describing the crime. The actual killer confessed to the murder five years after the investigation. Thereafter, the State's Attorney's office nol-prossed the cases against the plaintiffs.

¶ 126　　On review, the court upheld the trial court's admission of the actual killer's testimony, concluding that it was relevant: (1) to show that the plaintiffs received a favorable termination of the proceedings; and (2) to establish malice. *Aguirre*, 382 Ill. App. 3d at 98. As to malice, the plaintiffs had sought to introduce the actual killer's testimony to show that their confessions were false. Specifically, they sought to show that, although they did not speak to each other during the interrogations, their confessions were similar. From this, they believed that the jury could infer that the police told each plaintiff what to say, and this inference would help establish malice. The appellate court rejected the defendants' argument that, from the actual killer's testimony, the jury would have made several tenuous inferences. *Id.* at 99. In the court's view, the fact that the actual killer testified to intricate details of the crime that only the killer would know would not require the jury to draw an inference; rather, the jury could accept that he committed the crime. *Id.* Further, if he committed the crime, then the plaintiffs could not have committed it and their confessions were false. *Id.* The court noted that the actual killer's testimony also worked in concert with other evidence the plaintiffs presented to allow the jury to infer malice, specifically, that they were held in detention and could not have communicated with each other before the State filed charges, yet their versions of the events were substantially similar. *Id.*

¶ 127　　In *Porter*, the plaintiff sued a municipality and several police officers, alleging malicious prosecution. The plaintiff had been convicted of the 1982 murders of two individuals. In 1998, a third party confessed to (and was incarcerated for) the murders and, as a result, the State dropped the charges against the plaintiff and he was released from custody. The plaintiff filed a malicious-prosecution complaint against the defendants, asserting that the police targeted him as the shooter without probable cause to do so and coerced witness cooperation to obtain a conviction. He sought to introduce evidence of the third party's guilt through the deposition testimony of another party. The trial court granted the defendants' motion *in limine* to bar references to the third party's guilt contained in the deposition, finding that they were not relevant to the elements of malicious prosecution because there was no evidence from which to infer that the police should have suspected the third party of the crime while they were investigating the plaintiff. Following trial, the jury returned a verdict for certain of the defendants, finding that they had probable cause to charge the plaintiff with the murders and that they did not act with malice.

¶ 128　　On appeal, the plaintiff argued that the trial court erred in barring evidence of the third party's guilt. The plaintiff first asserted that the evidence was relevant to whether the

proceedings against him were terminated in a manner indicative of his innocence, an element the defendants had conceded. The appellate court held that the trial court did not err in excluding the evidence, noting that the trial court had allowed the plaintiff to publish to the jury the pardon he received from the Governor and had allowed him to tell the jury that the pardon was based on a finding of innocence. *Porter*, 393 Ill. App. 3d at 864. Addressing the plaintiff's second argument, that the evidence of the third party's guilt should have been admitted to support his theory of malice, the appellate court held that there was no evidence of a link between the third party's guilt and the plaintiff's theory that the police investigation was corrupt. *Id.* at 867. The party who gave the deposition was the only person who knew of the third party's involvement, and she withheld her knowledge from the police. *Id.* The court noted that, unlike the evidence of coerced confessions in *Aguirre*, there was no link in *Porter* between the third party's guilt and the plaintiff's theory that the police investigation was corrupt. *Id.* The court noted that later-discovered evidence is relevant to a malicious-prosecution claim only where there was a coerced confession (*i.e.*, like in *Aguirre*, "where the recanted testimony is more reliable than the confessions"). *Id.*[12]

¶ 129     Here, plaintiff argues that both *Aguirre* and *Porter* instruct that evidence that demonstrates police fabrication of a confession is admissible. Plaintiff concedes that the three-plaintiff scenario in *Aguirre* allowed the inference of fabrication to be easily drawn, but he maintains that neither that case nor *Porter* indicates that a "real" killer's subsequently obtained confession can support an inference of fabrication (and thus malice) in only the limited situation of multiple plaintiffs. He argues that, here, the jury ought to have decided whether to draw an inference of fabrication from the fact that plaintiff's alleged confession was inaccurate. Without the Outlaw evidence, the jury had no opportunity to evaluate how inaccurate plaintiff's confession was and, therefore, had no opportunity to infer malice from police fabrication. Plaintiff also attempts to distinguish *Porter* by arguing that the malice theory in that case was different from that in the present suit. According to plaintiff, unlike in *Porter*, he never argued that defendants initiated criminal proceedings against him maliciously because they had reason to suspect that Miller and Schneider had committed the crimes. Rather, he concedes that, when they were interrogating him, there was no evidence that defendants were aware of Miller's and Schneider's involvement. Plaintiff maintains that the Outlaw evidence was relevant to his claim because, as in *Aguirre*, it would have allowed the jury to infer that the police engaged in wrongdoing and fabricated a confession, and he maintains that *Porter* held that such evidence was admissible.

¶ 130     Defendants respond that the details of how Miller and Schneider carried out the murders would not have assisted the jury in evaluating whether defendants coerced statements from plaintiff and then withheld that the statements were couched in hypothetical terms or whether plaintiff voluntarily gave the statements. Defendants contend that the Outlaw evidence had no bearing on whether plaintiff's statements were voluntary or whether they were couched in hypothetical terms and, therefore, the evidence was properly excluded under *Porter*. In

---

[12]The *Porter* court, addressing the reliability of the third party's confession and "guilt," took judicial notice of the fact that he had subsequently recanted his confession. *Id.*

their view, the trial court granted plaintiff more latitude than was given in *Porter* when it permitted evidence that Miller and Schneider were apprehended in 1997, conveying, in defendants' view, the "false impression" that everyone in the courtroom agreed that plaintiff had nothing to do with his parents' murders. Given this "advantage," they urge that plaintiff should not have been permitted to present all of the details of the actual murders.

¶ 131      Defendants read *Porter* to hold that, where there is a stipulation of actual innocence, the actual killer's confession is admissible only if it demonstrates police misconduct through either fabricating confessions or ignoring other known suspects. Defendants argue that the Outlaw evidence does not suggest that defendants acted with malice, lacked a reasonable belief that plaintiff committed the murders, or falsified information concerning the crimes. Nor was there any evidence that defendants ignored evidence implicating Schneider and Miller or anyone else when they charged plaintiff. Further, defendants argue that the Outlaw evidence would have confused the jury and potentially led it to incorrectly infer that the later-discovered confession had something to do with whether there was probable cause. They also note that the admission of the Outlaw evidence would have triggered defendants' right to introduce the Ignasiak evidence, which would have distracted the jury and ventured into a "mini-trial" on plaintiff's involvement in the murders.

¶ 132      We reject plaintiff's claim that the Outlaw evidence was erroneously excluded. Both *Porter* and *Aguirre* are of limited value to our analysis. The *Porter* court upheld the exclusion of evidence of the third party's guilt. *Porter*, 393 Ill. App. 3d at 866-67. As to malice, the court held that, where there was no evidence of a *link* between the third party's guilt and the plaintiff's theory that the investigation was corrupt, evidence of the third party's guilt was properly excluded. *Id.* at 867. The deposed party withheld from police her knowledge of the third party's involvement. *Id.* Here, plaintiff concedes that, at the time of his interrogation, defendants were unaware of Miller's and Schneider's involvement in his parents' murders. Miller's and Schneider's involvement in the murders came to light in 1995; defendants charged plaintiff with the murders in 1993. Thus, in our view, *Porter* does nothing to support plaintiff's argument that the Outlaw evidence should have been admitted, because there was no evidence here of a *link*, from which malice may be inferred, between the real killers' guilt and plaintiff's theory that defendants fabricated his confession.

¶ 133      In *Aguirre*, the court upheld the admission of the real killer's testimony because that evidence *worked in concert* with other evidence to show that the plaintiffs' confessions were false and to imply malice. *Aguirre*, 382 Ill. App. 3d at 99. The other evidence included the fact that the three plaintiffs (who gave substantially similar versions of the events) were held in detention and could not have communicated with each other before the State filed charges. *Id. Aguirre* is distinguishable in two respects. First, there were three plaintiffs who gave essentially the same version of the events, which was ultimately contradicted by the evidence, whereas, here, there is only one plaintiff. Second and more significantly, unlike in *Aguirre*, the jury here heard evidence concerning alleged police prompting. In this respect, plaintiff's assertion that the details that only the actual killers knew were important and supported his theory that defendants manufactured his statements fails. Plaintiff provides several examples where, he alleges, defendants "prompted" him to fill in gaps in his version of the events. First, after plaintiff described cutting Ruth's throat (a detail he could provide

-28-

because he had been told of it), he began describing how he walked away from her body and toward the shop. According to defendants, however, they stopped plaintiff and asked him whether he had covered his mother with blankets or whether he remembered doing anything to the trailer door. Plaintiff contends that he then attempted to include in his hypothetical account how he covered his mother with blankets. Where he had not been prompted with details, such as the padlock on the trailer door, he did not mention those details. We reject plaintiff's argument because, as defendants note, police reports fully disclosed that the police advised plaintiff of these facts. Further, key details, such as the repeated slashings, head trauma, and side stabbing were presented by Dr. Blum.

¶ 134    Finally, even if introduction of the details of how Miller and Schneider committed the murders might have supported plaintiff's claim that neither he nor the police knew those details and, thus, might have led to an inference that his confession was the product of police suggestion, we conclude that plaintiff suffered no prejudice in light of the evidence that was presented in the present suit, most significantly: (1) the stipulation that plaintiff's criminal case terminated in his favor, that he was pardoned based on his innocence, and that the killers were apprehended; and (2) Dr. Blum's testimony.


¶ 135                    2. Discovery of "Real Killers" Evidence

¶ 136    Plaintiff next argues that the exclusion of evidence of how and by whom the "real killers" were discovered prevented him from demonstrating malice and left the jury to infer that defendants themselves played some role in plaintiff's exoneration. Plaintiff maintains that he was prejudiced by this exclusion. We reject plaintiff's claim.

¶ 137    The evidence of Schneider's and Miller's involvement, which federal authorities received while investigating other crimes, was critical, in plaintiff's view, to allow the jury to infer that, if defendants were not the ones who ultimately apprehended the "real killers," it was more likely than not that they acted with malice by making plaintiff out to be the murderer. Plaintiff argues that the jury should have had a full picture in front of it to assess malice. He asserts that, without the Outlaw evidence, the jury likely inferred that plaintiff was pardoned based on defendants' continuing investigation and that, if they continued their investigation and ultimately sought out the truth, they must not have acted with malice during the interrogation and when they charged plaintiff. Plaintiff argues that he should have been allowed to rebut this inference.

¶ 138    We disagree with plaintiff that there was a reasonable likelihood that the jury inferred that defendants played a role in plaintiff's exoneration. As defendants note, none of the trial evidence suggested that defendants played such a role, and the trial court generally limited the testimony to the interrogation period. Furthermore, plaintiff's assertion is speculative. It is equally, if not more, likely that the jury, if it inferred anything on this issue, inferred that a witness came forward with relevant evidence. In other words, the lack of evidence that defendants played no role does not necessarily lead only to the conclusion that defendants continued to investigate until they exonerated plaintiff. In any case, we cannot conclude that the trial court's ruling was unreasonable or an abuse of discretion. Throughout the proceedings the court commented that it was attempting to avoid a "mini-trial" concerning

plaintiff's potential involvement in the murders (*i.e.*, referring to Ignasiak's statement that plaintiff contracted with Miller to have his parents murdered). In this context, the court reasonably excluded the Outlaw evidence.

¶ 139                                    D. Jury Instruction

¶ 140     Plaintiff's final argument is that the trial court erred in giving the jury instruction on malice. He concedes that he failed to preserve this issue for review and asks that we address it only if we remand the cause for a new trial. Given that we are not remanding the cause for a new trial, because we have rejected plaintiff's claims concerning the evidentiary rulings, we need not address this argument.

¶ 141                                    III. CONCLUSION

¶ 142     For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 143     Affirmed.